Volterra, J.
Defendant Joseph Gall (“Gall”) has been indicted on eleven counts of larceny (G.L.c. 266 §30), twenty-five counts of forgery and uttering a forged instrument (G.L.c. 267 §§1, 5), and one count of failing to provide workers’ compensation coverage (G.L.c. 152 §25C). Defendant Employee Staffing of America (“ESA”) has been indicted on eleven parallel counts of larceny and one count of failing to provide workers’ compensation coverage. Both defendants now move to dismiss arguing that insufficient evidence was presented to the grand juiy, that the indictments are deficient because they lack the allegation of a necessary element, and that the Commonwealth’s claims are pre-empted by ERISA. For the following reasons, defendants’ motions are DENIED.
BACKGROUND
Between November of 1993 and December of 1994, the Special Grand Jury for Suffolk County was presented with thousands of pages of documentary evidence, and approximately seventeen witnesses regarding the instant case. The following relevant evidence was presented to the grand jury and must be viewed in a light most favorable to the Commonwealth:
ESA is a employee leasing company based in Milford, Connecticut. At all times relevant to the indictments Gall was the president of ESA. From 1987 through 1991 ESA operated in several states, including Massachusetts, where it leased thousands of workers to more than 100 client companies.
Under ESA’s employee leasing contracts with its client companies, the companies terminate their employees who are then hired by ESA. ESA then leases the employees back to the companies allegedly retaining administrative duties such as payroll services, payment of unemployment and payroll taxes, and the provision of workers’ compensation benefits. In turn, the client companies pay ESA each week an amount equal to the total payroll plus a percentage of the payroll necessary to cover taxes, workers’ compensation insurance, health insurance, and administrative costs.
On April 1, 1991, the company providing workers’ compensation insurance for ESA’s Massachusetts employees terminated benefits. Between January and *556 April of 1991, Gall was aware that it was unlikely that workers’ compensation insurance would be renewed, and yet he made minimal attempts to obtain a new policy other than discussing, but taking no action on, the possibility of an ERISA plan for self-insurance. Shortly after ESA’s policy was cancelled, the Department of Industrial Accidents (“DIA”) began to investigate ESA’s insurance status.[1] The DIA is authorized under G.L.c. 152 §25C to monitor companies to make sure they have insurance and impose sanctions if they do not.
Upon confirming that ESA no longer had insurance coverage, the DIA, on May 8, 1991, sent a letter to ESA indicating it was aware that ESA was not covered by insurance in the Commonwealth and that it was their intention to issue Stop Work Orders to client companies if ESA did not promptly obtain coverage.
ESA apparently believed it had an employee welfare benefit plan under ERISA. However, legal counsel for DIA informed ESA that the plan would not comply with Massachusetts law and that ESA would have to either apply for self-insurance status or purchase a policy for insurance. In response to this information, ESA, under the guidance of Gall, applied to the Massachusetts Workers’ Compensation Rating and Inspection Bureau (“Bureau”) to obtain coverage through the Assigned Risk Pool (“Pool”).
Over the next four months, ESA filed three applications with the Bureau, submitting the second one twice. Each time ESA applied, it failed to completely fill out the required forms and each time ESA calculated its total payroll as a differing amount, thus varying their premium. Based on the varying payroll amounts, the calculated premium ranged from $227,716.60 to $749,796.00. Applications seemed additionally suspicious because although ESA continually claimed to represent only thirty-two client companies the payroll jumped from $2,500,000.00 to $7.500,000.00 between ESA submitting its first application and the time it submitted its final application.[2]
Coverage was bound beginning on August 22, 1991. The premiums were based on thirty-two client companies and American Policyholders Insurance Company (“API”) was the assigned sevicer of the premiums. In early 1992, DIA received a faxed list of 120 ESA client companies. The listwas forwarded to the Bureau and eventually t o API. When the Bureau contacted ESA and threatened that coverage would be terminated unless they disclosed all (heir client companies, Gall agreed to provide a complete list. The list contained 212 companies, far more than had been listed on the API policy.
After adding all of the client companies, the premium for the policy was $5,527,511.00. However, ESA stopped paying the premiums at that point and terminated the policy on June 26, 1992.
Between April and August 1991, when ESA had no workers’ compensation coverage, many of ESA’s clients requested proof of insurance from ESA. Gall simulated valid certificates on a computer and listed either EMPCO or Alexander EMPCO as the producer. Both are fictitious companies created by Joseph Gall. Additionally, the certificates listed the workers’ compensation carrier as Ascona Reinsurance Company, also a non-existent company created by Gall. During the period that ESA had no workers’ compensation coverage at least twenty-five forged certificates were issued to client companies.
DISCUSSION
In general, a court will not inquire into the quality of evidence heard by a grand jury. Commonwealth v. Lammi, 310 Mass. 159 (1941). However, judicial inquiry is justified to consider whether sufficient evidence was presented to the grand jury to support a finding of probable cause to arrest the defendant for the crime charged. Commonwealth v. McCarthy, 385 Mass. 160, 162-63 (1982). The Supreme Judicial Court has recognized that probable cause to arrest is a “considerabl(y] less exacting [standard] than a requirement of sufficient evidence to warrant a finding of guilty.” Commonwealth v. O’Dell, 392 Mass. 445, 451 (1984). An indictment cannot stand unless it is supported by evidence sufficient to establish the identity of the accused and probable cause to believe the defendant has committed the offenses charged. Commonwealth v. O’Dell, 392 Mass. 445, 450 (1984), citing Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982).
A. Insufficiency of Evidence 1. ERISA preemption
The defense argues that their plan for providing employee disability and accident benefits constitutes an “employee welfare benefit plan” under ERISA and that, therefore, G.L.c. 152, §25C is preempted by ERISA.[3]
Although it is well established that ERISA contains broad preemption language, specific plans are exempted from this preemption. 29 U.S.C. §1144(a) (1985 and Supp.1995). Particularly, Section 1003(b) provides for the exemption of, “any employee benefit plan if . . . such plan is maintained solely for the purpose of complying with applicable workers’ compensation laws or unemployment compensation laws or disability insurance laws.”
The Supreme Court has interpreted this ERISA provision to mean that although a state could not regulate the terms of the ERISA plan, it “may require an employer to maintain a disability plan complying with state law as a separate administrative unit.” Shaw v. Delta Air Lines, 463 U.S. 85, 108 (1983). This case is applicable to the case at bar since disability insurance laws and workmen’s compensation laws are governed by the same provision of ERISA.
The First Circuit has also specifically applied Shaw to workmen’s compensation laws. Combined Mgt. v. Superintendent of Bur. of Ins., 22 F.3d 1, 4 (1st Cir. 1994) (holding that an employee leasing company’s *557 ERISA plan did not preempt state worker’s compensation statute).
Defendants claim that the case at bar is distinguishable from Combined Mgt. because ESA’s plan also included medical benefits and was therefore not created “solely” to comply with the Massachusetts workers’ compensation laws. However, the plan in Combined Mgt also coupled workers’ compensation with a welfare benefit plan. Therefore, the distinction appears to be based in words alone. As this Court can find no support for this argument, and the defendants have provided none, I reject their reasoning.[4]
Under the above reasoning this Court need not address defendants’ other preemption arguments as defendants were required to provide workers’ compensation regardless of any ERISA plan which they might have had.
2. Larceny
The elements of larceny by false pretenses are 1) making a false statement, 2) which the defendant knew or believed to be false, 3) which the defendant made intending that the person to whom it was made would rely upon it as a true statement, 4) the person to whom the statement was made did in fact rely on the statement, and 5) as a result of that reliance the person parted with personal property. G.L.c. 266, §30(1).
Defendants were charged with ten counts of larceny against the client companies and one charge of larceny against API and the Assigned Risk Pool. Defendants attempt to argue that no larceny occurred because ESA paid all claims. However, payment of claims does not negate any element of larceny.
The Commonwealth presented evidence to the grand jury that ESA represented to client companies that it provided workers’ compensation insurance during a period when no coverage existed. ESA did this through its signed contracts with the companies and with weekly invoices which were forwarded by ESA to each client company charging the clients for the provision of workers’ compensation coverage. The client companies paid for the non-existent insurance each week with a check. Copies of these checks were also presented to the grand jury. Although Gall claims never to have made or known of these false representations, as president of ESA, he is vicariously liable for his employees’ actions if the employees were acting within the scope of their employment and were motivated, at least in part, by the goal of serving their employer’s interests. Veranda Beach Club Ltd. Partnership v. Western Sur. Co., 936 F.2d 1364, 1373 (1st Cir. 1991), citing Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854 (1986).
For the final count of larceny against API and the Pool the Commonwealth presented evidence, which the defense does not deny, that they applied for insurance coverage for only thirty-two companies when in reality ESA had contracted with over 200 client companies. As a result of their false representations, Defendants were able to acquire coverage for all of their Massachusetts clients for approximately $1,000,000.00. Had they disclosed the actual amount of client contracts to API and the Pool, their premiums would have been over $5,000,000.00.
This lack of insurance caused defendants to became involved in a scheme where they would add companies to the policy if the company filed a claim. Such a plan is dishonest and undermines the entire process by which an insurer provides insurance coverage. For the above reasons, this Court finds that the evidence presented to the grand jury established probable cause upon which to indict both defendants for each of the eleven counts of larceny.
3. Forgery and Uttering Forged Instruments
The elements of forgery are: 1) making, altering, forging, or counterfeiting; 2) an instrument set forth in chapter 267, §1; and 3) with intent to deceive or defraud. G.L.c. 267, §1.
The elements of uttering are: 1) offering as genuine; 2) an instrument set forth in the statute; 3) which the defendant knows to be false; and 4) with intent to defraud. G.L.c. 267, §5.
Defendant Gall argues that the indictments under both counts must fail because although the indictments charge Gall with forging and uttering “a policy of insurance and/or a certificate of insurance,” the only evidence before the grand jury related to the falsification and publication of certificates of insurance, and certificates of insurance are not governed by c. 267.[5]
A group life insurance policy constitutes a contract of insurance between the individual insured members and the insurer; the certificate issued to the insured is evidence of that insurance. Appelman, Insurance Law and Practice , §46 (1981). A certificate certainly must be considered part of the existing contract. Id.
The Supreme Judicial Court has concurred with this interpretation of a certificate holding that when a certificate’s terms differ from those of the policy the language of the certificate prevails. Kirkpatrick v. Boston Mutual Life Ins. Co., 393 Mass. 640, 647-48 (1985). If the insurer chooses to draft and to issue these certificates in language it selected, then it cannot be heard to complain that such language does not express the intention of the parties. Id., citing Appelman, §46 at 158.
This principal is equally applicable if the insurer acts through an agent in preparing and issuing the certificates. Id.
In this case, it would appear that the certificate of insurance served the same function as the policy of insurance. Indeed, for the purposes utilized by ESA, the certificate was the policy. The Massachusetts Court of Appeals has interpreted the clause “policy of insurance” as used in G.L.c. 267, §1 in a broad manner. Commonwealth v. Levin, 11 Mass.App.Ct. 482 (1981). Accordingly, this Court finds that the *558 Commonwealth presented sufficient evidence on these indictments.
Defendants additionally argue that insufficient evidence was presented to the grand jury to show that Gall “uttered” certificates of insurance. The evidence presented showed that Gall created a phony form for the certificates. The certificates were created for dissemination to client companies in Massachusetts for whom no insurance coverage was being provided. Clerical personnel, acting under the direction and control of Gall, would then fax or mail these phony certificates to client companies upon their request.
This Court finds this evidence sufficient to justify the grand jury’s indictment of defendants for uttering a forged instrument.
B. Failure of the Indictment
A motion to dismiss may be allowed if the indictment read with the bill of particulars fails to contain, “a concise description of the act which constitutes the crime or an appropriate legal term descriptive thereof.” Mass.R.Crim.P. 4(a). An indictment which fails to contain an allegation of a fact or element which is an essential ingredient of the offense charges no crime. Commonwealth v. Burns, 8 Mass.App.Ct. 194, 196 (1979).
In the instant case the defendants argue that the charge of failing to provide insurance (G.L.c. 152, §25C) must fall because the statute and the indictments do not allege scienter.
Black’s Dictionary defines scienter as:
Knowingly, a term used in pleading to signify an allegation (or that part of the declaration or indictment which contains it) setting out the cause which led to the injury . . .
Black’s Law Dictionary 1207 (5th ed. 1979).
Knowledge does not have to be alleged even if it is an element of the crime. Commonwealth v. Green, 399 Mass. 565, 567 (1987). Therefore, despite the fact that the Commonwealth did not allege scienter it was not required and the defendant’s argument must fail.[6]
Additionally, G.L.c. 152, §25C is a public welfare offense and, as such, proof of a mens rea is not required. The statute specifically states that the purpose is, “to promote the health, safety and welfare of employees ...” The fact that the statute clearly and unambiguously states that its purpose is for the public welfare combined with the fact that the criminal provisions of c. 152, §25C do not contain language establishing a mens rea element, evidences the legislature’s intent to make this statute a strict liability offense. See Morisselte v. United States, 342 U.S. 246, 255-56 (1951); Commonwealth v. Buckley, 354 Mass. 508, 510 (1968).
The Commonwealth additionally cites to a similar statute in New York which has been held to be a strict liability offense. People v. Nogueras, 42 N.Y.2d 956 (1977) (“failure to secure the payment of [workers’] compensation shall constitute a misdemeanor punishable by a fine of not more than five hundred dollars or imprisonment for not more than one year or both”).
The evidence presented in the case at hand shows that ESA did not provide workers’ compensation insurance. Furthermore, they took active and deceitful steps towards applying for insurance within the Pool. For the above stated reasons, this Court finds that the indictment under G.L.c. 152, §25C should stand.
ORDER
For the foregoing reasons, it is hereby ORDERED that Defendants’ Motions to Dismiss are DENIED.

Because of the structure of ESA’s business, DIA’s computer system was unable to determine where ESA had employees because they were listed under the client company name rather than ESA. This difficulty prompted DIA to contact ESA’s previous insurer and obtain a list of ESA’s client companies.

The Bureau further distrusted ESA’s calculations because the DIA was aware of the number of client companies since it had copies of ESA’s client lists from previous investigations. These lists recognized 120 client companies which ESA had contracted with. This information was eventually forwarded to API, the company which was assigned to insure ESA in the Pool.

The Commonwealth contends that ESA at no time had an ERISA plan. An evaluation of whether ESA established a benefit plan and could therefore invoke the protections of ERISA’s preemption provision would involve a fact intensive inquiry. Thus, for the purposes of this threshold question only, ESA’s plan is assumed to be a valid ERISA benefit plan. See Combined Mgt v. Superintendent of Bur. of Ins., 22 F.3d 1, 3 (1st Cir. 1994).

Defendants incorrectly interpret Combined Mgt to hold that economic impact is sufficient to trigger preemption. In fact, the court explicitly stated, “. . .we decline to address whether a significant economic impact on an ERISA covered plan may be sufficient by itself to trigger preemption ...”

General Laws chapter 267, Section 1, reads in relevant part:
Whoever, with intent to injure or defraud, falsely makes, alters, forges or counterfeits a public record, or a certificate, return or attestation of a clerk or register of a court, public register, notary public, justice of the peace, town clerk or any other public officer, in relation to a matter wherein such certificate, return or attestation may be received as legal proof; of a charter deed, will testament, bond or writing obligatory, power of attorney, policy of insurance . . . shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years. [Emphasis added.)

The defense argued that ESA and Gall were prevented from obtaining insurance by the unlawful actions of the Commissioner of Insurance and the Bureau. As a result prosecution for failure to provide workers’ compensation insurance would violate Article 12 of the Massachusetts Declaration of Rights and the Due Process Clause of the United States Constitution. Both the defense and the Commonwealth agree that the Bureau did insure ESA. The evidence taken in the light most favorable to the Commonwealth suggests that any difficulty in beginning insurance coverage occurred only because of ESA’s failure to disclose pertinent insurance information.